IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAWN KINSELLA, ) | |
| ) | Case No. 08 C 2666 |
| Plaintiff, ) | |
| ) | Judge Virginia M. Kendall |
| v. ) | |
| ) | |
| AMERICAN AIRLINES, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dawn Kinsella ("Kinsella") sued her former employer, Defendant American Airlines, Inc. ("American"), alleging that American discharged her in retaliation for exercising her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and interfered with her substantive exercise of rights under the FMLA. American moves for summary judgment on both claims. American also moves for sanctions and dismissal on the ground that Kinsella committed perjury in her deposition. For the reasons stated below, the Court grants American's Motion for Summary Judgment and denies American's Motions for Sanctions and Dismissal on the Grounds of Perjury .

**STATEMENT OF UNDISPUTED FACTS**

American operates a facility at O'Hare International Airport in Chicago, Illinois, where Kinsella worked as a Ticket Lift Agent starting on March 6, 1989. (Pl. 56.1 Resp. ¶¶ 2, 4.)[1]

---

[1] Citations to "Defendant's Local Rule 56.1(a)(3) Statement of Material Facts" have been abbreviated to "Def. 56.1 Exh. __, p.__."; citations to "Plaintiff's Local Rule 56.1(a)(3) Response to Defendant's Statement of Material Facts" have been abbreviated to "Pl. 56.1 Resp. ¶ __."; citations to "Plaintiff's Local Rule 56.1 Statement of Additional Facts" have been abbreviated to "Pl. 56.1 Exh.__, p.__."; and citations to "Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts" has been abbreviated to "Def. 56.1 Resp. ¶ __."

The Court notes that Kinsella has failed to comply with Local Rule 56.1. Kinsella frequently denies American's facts

1

American transferred Kinsella to a position as a Ticket Counter Agent sometime after 1992, where she served until her discharge in May 2006. (Pl. 56.1 Resp. ¶ 5.) During her tenure as a Ticket Counter Agent, Lynn Mazzucchelli-Sumiec ("Mazzucchelli") supervised Kinsella. (Pl. 56.1 Resp. ¶ 6.) Michael Kinsella, Dawn Kinsella's husband, began working at American in 1984. (Pl. 56.1 Resp. ¶ 7.) At the time of Dawn Kinsella's discharge in May 2006, Michael Kinsella worked as a unionized Crew Chief over Fleet Service Clerks. (Pl. 56.1 Resp. ¶ 7.)

American has a set of guidelines and principles entitled "Rules of Conduct" with which all Ticket Agents are required to comply. (Pl. 56.1 Resp. ¶ 8.) Rule 16 of the Rules of Conduct provides that "[m]isrepresentation of facts or falsification of records is prohibited." (Pl. 56.1 Resp. ¶ 9.) Rule 34 further states that "[d]ishonesty of any kind in relations with the company, such as . . . misrepresentations in obtaining employee benefits or privileges, will be grounds for dismissal and, where the facts warrant, prosecution to the fullest extent of the law." (Pl. 56.1 Resp. ¶ 10.) Kinsella signed American's "Company Policy Regarding Dishonesty" on March 7, 1989. (Pl. 56.1 Resp. ¶ 11.) That policy reminds employees that "[n]o exception can be made under Rule # 34. Discharge and prosecution, when applicable, are mandatory." (Pl. 56.1 Resp. ¶ 11.) Any violation of American's Rules of Conduct by an employee can be grounds for immediate discharge depending upon the severity of the incident and the employee's record. (Pl. 56.1 Resp. ¶ 12.)

---

without citation to the record or by introducing new facts that do not directly refute the facts stated. Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, this Court will not consider portions of Kinsella's submissions and denials of American's facts that are non-responsive or do not contain proper support from citations to the record. The Court further disregards all additional facts set forth in Kinsella's responses that are not properly set forth in her 56.1(b) Additional Statement of Facts.

American also has an Attendance Management Policy that applied to Kinsella in May 2006. (Def. 56.1 Resp. ¶ 19.) That Policy has a progressive or step discipline plan, but also states that "[f]raudulent use of the sick leave benefit is considered to be dishonest and will result in termination of employment." (Def. 56.1 Resp. ¶ 19; Def. 56.1 Exh. D.) As of May 2006, Kinsella was a self-managed employee under the American Airlines Attendance Policy. (Def. 56.1 Resp. ¶ 10.)

American has a separate Sick Leave Benefit Policy stating that American "provides a Sick Leave Benefit for your use when you are unable to work due to illness or injury . . . . Use of this benefit for any other reason is not allowed . . . . Fraudulent use of the sick leave benefit is considered to be dishonest and will result in termination of employment." (Pl. 56.1 Resp. ¶ 13.) Misusing sick time is a violation of Company policy. (Pl. 56.1 Resp. ¶ 14.) Kinsella knew, as of May 4, 2006, that under American's policies she could not take sick time if she, herself, was not ill. (Pl. 56.1 Resp. ¶ 15.) Moreover, as of May 2006, Ticket Counter Agents who were too sick to work were responsible for calling American's zone support sick line to inform American of their absence before the beginning of their shifts, while a Crew Chief over Fleet Service Clerks had to call a different sick line number. (Pl. 56.1 Resp. ¶ 16.) An employee of American taking approved family medical leave ("FML") for her own illness or that of an eligible family member in May 2006 had to report her use of such leave by calling American's FML telephone line at 773-686-2517 in addition to the sick line number. (Pl. 56.1 Resp. ¶ 17.) An employee had 48 hours after returning to work to call the FML line. (Def. 56.1 Resp. ¶ 21.) A Family Leave Coordinator at O'Hare would then ensure that the FML was properly coded in the system. (Pl. 56.1 Resp. ¶ 18.)

American granted Kinsella intermittent FML in 1997, 1999, 2000, 2001, 2004, 2005, and 2006 to care for her son, Zachary Kinsella, who has juvenile diabetes. (Pl. 56.1 Resp. ¶ 20; Def.

3

56.1 Resp. ¶ 3.) Kinsella did not suffer adverse action as a result of applying for or taking FML during those years. (Pl. 56.1 Resp. ¶ 21.) Michael Kinsella also took FML leave to care for his son periodically during his employment with American. (Pl. 56.1 Resp. ¶ 22.) As of May 2006, American did not have a policy prohibiting a husband and wife from taking vacation leave together or missing work on the same day, prohibiting one spouse from taking one type of leave and the other spouse from taking another type of leave on the same day, or prohibiting a husband and wife from calling in sick on the same day. (Def. 56.1 Resp. ¶¶ 6-9.)

Deborah Havens ("Havens"), who worked in a position responsible for Ticket Agent management between 2000 and 2005, received complaints from several of Kinsella's co-workers alleging that Dawn and Michael Kinsella took time off work simultaneously and perhaps were abusing the system. (Pl. 56.1 Resp. ¶ 25.) In 2005, American promoted Havens to the position of Manager of Airport Services, where she became responsible for reviewing the list of employees who took time off of work for any reason. (Pl. 56.1 Resp. ¶ 26.) Certain behavioral patterns, including a pattern of lost time together by husband and wife, trigger a suspicion that an employee could be abusing a Company leave benefit. (Pl. 56.1 Resp. ¶ 27.)

On Thursday, May 4, 2006, at 3:25 a.m., Kinsella called American's sick line and informed the operator that she would not be reporting to work that day because she was sick. (Pl. 56.1 Resp. ¶ 28.) At 3:48 a.m. on the same day, her husband Michael Kinsella called the sick line for Fleet Service Clerks. (Pl. 56.1 Resp. ¶ 28.) Later that day, Havens looked at the list of employees who called off sick that day and noticed that both Dawn and Michael Kinsella had made these calls. (Pl. 56.1 Resp. ¶ 29.) Havens subsequently reviewed Dawn and Michael Kinsella's time and attendance records and noted a pattern of simultaneous absences that did not include simultaneous vacation

4

days or days off scheduled in advance. (Pl. 56.1 Resp. ¶ 30.) These instances included: (1) September 25, 2001, when Dawn Kinsella arranged a change of shift with a co-worker and Michael Kinsella called in FML; (2) December 27, 2001, when Dawn Kinsella took a flex vacation day and Michael Kinsella called in sick; (3) June 20, 2002, when Dawn Kinsella took FML and Michael Kinsella called in sick; (4) August 8, 2002, when Dawn Kinsella took FML and Michael Kinsella took time off due to an injury; (5) November 27, 2002, when Dawn Kinsella took a vacation day and Michael Kinsella called in sick; (6) December 17 and 19, 2002, when both Kinsellas called in sick; (7) December 16, 2003, when both Kinsellas called in sick; (8) May 9, 2005, when Dawn Kinsella arranged a change of shift and Michael Kinsella called in sick; (9) August 1 through 4, 2005, when Dawn Kinsella had unpaid absences and Michael Kinsella took vacation days; (10) November 7, 2005, when Dawn Kinsella took FML and Michael Kinsella took a vacation day; (11) December 22, 2005, when Dawn Kinsella took FML and Michael Kinsella took a vacation day; and (12) December 30, 2005, when Dawn Kinsella took FML and Michael Kinsella arranged a change of shift. (Pl. 56.1 Resp. ¶ 31.)

Havens noticed in the course of her review that on several occasions one of the Kinsellas would use FML and the other would take time off for some other reason. (Pl. 56.1 Resp. ¶ 32.) Havens grew suspicious that perhaps the Kinsellas were misusing their sick leave, and assumed (mistakenly) that because both had called in sick on May 4, 2006, one or both of them might call in FML. (Def. 56.1 Exh. G p. 179-80; Exh. H ¶ 9.) As a result of her concerns, Havens asked Acumen Probe, a third-party, to conduct a surveillance of the Kinsellas' activities on May 4, 2006. (Pl. 56.1 Resp. ¶ 34; Def. 56.1 Resp. ¶¶ 1-2.)

At 10:17 pm on May 4, 2006, Kinsella called in sick for May 5, 2006, and then did not work on May 6 or 7, 2006 because they were her scheduled days off. (Pl. 56.1 Resp. ¶¶ 35-36.) Kinsella also did not report to work on May 8, 2006, after arranging a change of shift on April 23, 2006 because of her daughter's Confirmation, and did not report to work on May 9, 2006 because she called in sick at 2:50 a.m. that day. (Pl. 56.1 Resp. ¶ 37.)

Acumen Probe provided Havens with a video and written report documenting the results of its surveillance sometime after May 4, 2006. (Pl. 56.1 Resp. ¶ 39.) The report spans the hours of 2:15 PM to 8:05 PM on March 4, 2006, and describes an individual believed to be Michael Kinsella cutting the grass of his property and then riding a motorcycle, and an individual believed to be Dawn Kinsella driving a vehicle to and from the house and then sweeping the garage. (Pl. 56.1 Resp. ¶ 39; Def. 56.1 Exh. 7 of Exh. G.)[2] Havens has no medical training to determine if an employee is sick. (Def. 56.1 Resp. ¶ 12.) However, after examining the video and report, Havens believed that further action was required. (Pl. 56.1 Resp. ¶ 40.) Upon review of American's time and attendance reports, Havens noted that Dawn Kinsella called in sick on May 5, 2006 and Michael Kinsella called in sick on May 7, 2006. (Pl. 56.1 Resp. ¶ 41.) Havens no longer suspected that the Kinsellas were misusing FML after noting that the their time off was coded "SK," or personal sick time, and that

---

[2] Kinsella seeks to introduce as a fact the following statement in the surveillance report from Acumen Probe: "the following employees (husband/wife) called in FML today." (Pl. 56.1 Exh. B, p. 1.) This statement constitutes hearsay under Federal Rule of Evidence 801(c) because it is not testimony from a trial or hearing, and is offered to prove the truth of the matter asserted—namely, that Kinsella called in FML on May 4, 2006. *See* Fed. R. Evid. 801(c). The Court finds that the statement does not constitute a party admission under Federal Rule of Evidence 801(d)(2), because it is undisputed that American did not have any role in authoring the surveillance report and that Havens, the American employee who contacted Acumen Probe, did not know on May 4, 2006 whether the Kinsellas had or would call in FML for the day. *See* Pl. 56.1 Resp. ¶ 42; Fed. R. Evid. 801(d)(2). Accordingly, the Court determines that the statement constitutes inadmissible hearsay, and will not consider it for purposes of this summary judgment motion. *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 534 (7th Cir. 2003) (noting that hearsay statements are not competent evidence that may be used to oppose a motion for summary judgment); *see also Bradley v. Work*, 154 F.3d 704, 707-08 (7th Cir. 1998) (district court did not abuse its discretion by striking portions of L.R. 56.1 statement when the submissions did not conform with local rules and contained inadmissible hearsay).

none was coded FML (unpaid time) or VCF (family leave paid through vacation time). (Pl. 56.1 Resp. ¶ 42.) She was still, however, concerned that they were potentially abusing their sick leave. (Pl. 56.1 Resp. ¶¶ 42-43.) Mazzucchelli, Dawn Kinsella's manager, read the surveillance report on May 11, 2006. (Def. 56.1 Resp. ¶ 14.)

On May 10, 2006, Mazzucchelli, Mary Ouimet (a peer witness), and a scribe met with Kinsella to discuss possible abuse. (Pl. 56.1 Resp. ¶¶ 44-45.) Kinsella stated that she had been sick with the same illness "off and on" between May 4 and May 9, 2006, but never saw a doctor, and could not recall if she left the house on May 4 or 5, 2006, or if she was sick at home and in bed. (Pl. 56.1 Resp. ¶¶ 46, 49.) She later described certain of her activities between May 4 and May 9, including picking up her children, hosting ten people at her home for her daughter's Confirmation, going to the store, dropping of her son, and taking her friend to the airport. (Pl. 56.1 Resp. ¶ 50.) Kinsella refused to answer questions about her husband, but informed Mazzucchelli that her children had similar symptoms and missed school on Monday, May 8, 2009. (Pl. 56.1 Resp. ¶¶ 47-48.) She later stated that she scheduled the CSO for Monday, May 8, 2009 and arranged for her children to be out of school because of pre-arranged plans. (Pl. 56.1 Resp. ¶ 51.) Mazzucchelli confirmed with Kinsella that she was expected to tell the truth and her failure to do so could result in corrective action, including discharge, and asked her if she had anything to add to the investigation, to which Kinsella responded "no." (Pl. 56.1 Resp. ¶¶ 48, 51.) Kinsella also prepared a written statement during the May 10, 2006 meeting, which provided in relevant part: "Meeting of 5/10 resulting from an investigation regarding sick time used on 5/4, 5/5, and 5/9. During those 3 days, reported ailments of diarrhea, flu like symptoms." (Pl. 56.1 Resp. ¶ 52.)

Mazzucchelli decided to withhold Kinsella from service without pay pending further review

of the situation, and met with Kinsella again, along with Mary Ouimet and Gary Baker (another Customer Service Manager), on May 11, 2006. (Pl. 56.1 Resp. ¶¶ 53-54.) At the May 11 meeting, Kinsella claimed that she was sick during the day and night of May 4, but recalled that she took her children to the dentist that day as well. (Pl. 56.1 Resp. ¶ 55.)

Mazzucchelli conceded that she could not know whether Kinsella was sick on May 4, 2006. (Def. 56.1 Resp. ¶ 18.) However, Mazzucchelli did not believe that Kinsella had been truthful during the May 10 and 11, 2006 meetings because she could not remember what she did or whether her children attended school just days earlier, and she admitted to running errands and having a party during the days that she claimed she was sick. (Pl. 56.1 Resp. ¶¶ 56-57.) Kinsella also did not see a doctor during the period she claimed to be sick. (Pl. 56.1 Resp. ¶ 58.)

Mazzucchelli's manager, Kirby, consulted with Mazzucchelli and concurred in her decision to discharge Kinsella because Mazzucchelli did not find Kinsella credible and because she took sick days off in conjunction with her scheduled days off. (Pl. 56.1 Resp. ¶ 59; Def. 56.1 Resp. ¶ 13.) On May 11, 2006, Mazzucchelli issued a Final Advisory discharging Kinsella from her employment for violating Rules 16 and 34, which prohibit the misrepresentation of facts and dishonesty. (Pl. 56.1 Resp. ¶ 61.) American did not apply its progressive discipline program contained in its Attendance Policy to Kinsella's conduct. (Def. 56.1 Resp. ¶ 20.) American also discharged Michael Kinsella after he was investigated pursuant to the procedures of the collective bargaining agreement between his union and American. (Pl. 56.1 Resp. ¶ 63.)

After Dawn Kinsella received her Final Advisory, she submitted a written grievance requesting a meeting with Arthur Pappas ("Pappas"), American's Vice President for Chicago. (Pl. 56.1 Resp. ¶ 63.) Kinsella met with Pappas on two occasions. (Pl. 56.1 Resp. ¶ 63.) During those

8

meetings, Kinsella does not specifically recall discussing her FMLA leave with Pappas. (Def. 56.1 Exh. C, p. 230.) American denied Kinsella's grievance on July 7, 2006, finding that her termination was for "just cause." (Pl. 56.1 Resp. ¶ 71.)

Kinsella then requested a binding arbitration hearing in accordance with company policy, which took place on December 13, 2006 before an independent hearing officer, Robert H. Redd ("Redd"). (Pl. 56.1 Resp. ¶ 73.) Redd concluded that Kinsella could have performed her normal duties when she was allegedly sick during the days in question, and upheld her discharge. (Pl. 56.1 Resp. ¶ 74.) While preparing for this arbitration, Kim Rouch ("Rouch"), a Senior Representative in Human Resources who consulted with Mazzucchelli during the investigation of Kinsella, saw the school records of the Kinsellas' two minor children. (Pl. 56.1 Resp. ¶¶ 59-60; Def. 56.1 Resp. ¶¶ 4-5; Pl. 56.1 Exh. D, pp. 56-58.) Rouch does not recall if she or someone else at American obtained those records, and does not recall if the Kinsellas authorized the release of that information. (Pl. 56.1 Exh. D, pp. 56-58.)

Under American's FML policy, because Kinsella returned to work on May 10, 2006, she had until May 11, 2006 at midnight to call in FML, and she was discharged prior to midnight on May 11. (Def. 56.1 Resp. ¶ 22.) At the time Kinsella submitted her grievance with American, she did not believe that she had been wrongfully terminated for using FML. (Pl. 56.1 Resp. ¶ 64.) Kinsella's son, for whom American had previously approved FML, did not stay home from school on May 4, 5, or 9. (Pl. 56.1 Resp. ¶ 77.) Indeed, Kinsella never mentioned during the meetings on May 10 and 11, in her written statement prepared on May 10, or during her arbitration hearing, that she called in FML to care for her son on May 4, 5, or 9. (Pl. 56.1 Resp. ¶¶ 62, 75.)

Kinsella's cellular and home telephone records for May 2006 show that she never called the

9

FML number (773-686-2617) that month. (Pl. 56.1 Resp. ¶¶ 79-80.) Her home telephone records do, however, show that she called the zone support sick call line at 3:25 AM and 10:17 PM on May 4, 2006 and at 2:50 AM on May 9, 2009. (Pl. 56.1 Resp. ¶ 79.) AT&T's and T-Mobile's custodians of record, Patricia Cauldwell and Phyllis Washington, do not in their affidavits address the accuracy of the telephone records to which they refer. (Def. 56.1 Resp. ¶ 16.)

Kinsella never suffered any adverse employment action as a result of taking or applying for FML for the care of her son. (Pl. 56.1 Resp. ¶ 67.) Moreover, no American employee ever told Kinsella that she was being terminated because she exercised her rights under the FMLA. (Pl. 56.1 Resp. ¶ 67.) Kinsella never believed that Mazzucchelli or Kirby treated her unfairly, and to the best of her knowledge, no other employee at American engaged in the same conduct she engaged in and was not terminated. (Pl. 56.1 Resp. ¶¶ 66, 68.) On May 8, 2008, Kinsella filed this action alleging that "American Airlines terminated Plaintiff's employment on May 11, 2006, when she exercised her rights under the FMLA, contrary to and in violation of Section 2615 of the Act." (Cmplt. at p. 3.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment

to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

Although Kinsella's Complaint does not clearly indicate the theories of liability she is pursuing under § 2615 of the FMLA, the Complaint might be construed to allege both that American discharged Kinsella in retaliation for exercising her rights under § 2615(a)(2) of the FMLA, and that American interfered with her substantive exercise of rights under § 2615(a)(1) of the FMLA. (Cmplt. at p. 3.) The Court addresses each of these claims in turn.

### I. FMLA Retaliation

Section 2615(a)(2) "makes it unlawful for an employer to discharge or discriminate against an employee for opposing a practice made lawful by the Act." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (citing 29 U.S.C. § 2615(a)(2)). An employee who claims that her employer discharged her in retaliation for exercising her rights under § 2615(a)(2) may proceed under either the direct or indirect method of proof. *See id.* at 593.

## A. Direct Method of Proof

Under the direct method of proof, Kinsella has the burden of establishing a *prima facie* case of retaliation by showing that: (1) she engaged in an activity protected by the FMLA; (2) American took adverse employment action against her; and (3) there is a causal connection between her protected activity and the American's adverse employment action. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). American does not dispute that it took an adverse employment action against Kinsella when it terminated her employment. American contends, however, that Kinsella has not met her burden of establishing the first and third elements of her *prima facie* case: namely, that she engaged in protected activity and that there was a causal connection between that activity and her discharge. *See id*. The Court begins by noting that Kinsella severely undermines her retaliation claim by admitting that American never took an adverse action against her because she exercised her rights under the FMLA.

### 1. Protected Activity

Kinsella claims that she has satisfied the burden of showing she engaged in protected activity both because she called the FML line on May 4, 5, and 9, 2006, and because even if she did not call the FML line, she would have called on May 11, 2006 had she not been discharged. With respect to her first argument, the parties dispute whether Kinsella in fact called the FML line on May 4, 5, and 9, 2006. Kinsella testified unequivocally in her deposition that she called the FML line from her home or cellular phone on each of these three days to care for her son. (Def. 56.1 Ex. C at pp. 109, 110, 113, 115, 135, 137, 166, 169, 170, 174). American, however, maintains that she did not call because, as Kinsella concedes, her cellular and home phone records reveal that she made no

12

such call on any of those days.[3]  Moreover, through two days of questioning by her supervisor, a meeting with Pappas, a written statement, and an arbitration, Kinsella never mentioned that she had called in FML on May 4, 5, or 9, 2006.  Further supporting American's position, although Kinsella testified that she called in FML leave to care for her son, her son in fact attended school on May 4, 5, and 9, 2006.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 379-81 (2007).  In *Scott*, a videotape blatantly contradicted a motorist's testimony about the way that he was driving, and there were no allegations that a videotape was doctored in any way.  *See id.*  The Supreme Court reversed the lower court's denial of summary judgment, finding that "the Court of Appeals should not have relief on such visible fiction" in determining that the motorist's testimony created a genuine issue of material fact.  *See id.*  Similarly here, where Kinsella does not allege that the telephone records were doctored and offers no other explanation for the absence of the FML telephone number on her records, the Court will not rely on her testimony to create a genuine issue of material fact as to whether she engaged in protected activity.

Kinsella next argues that if she had not been discharged on May 11, 1006, she would have engaged in protected activity by designating her absences as FML within 48 hours of her return to work on May 10, 2006.  "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. Of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004); *see also Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[A]

---

[3] The Court notes that Kinsella's argument that the telephone records themselves are not properly before this Court is immaterial, because Kinsella has admitted that those records are devoid of any call to the FML line.  (Pl. 56.1 Resp. ¶¶ 80-81).

plaintiff's speculation is not a sufficient defense to a summary judgment motion."). In her deposition, Kinsella testified only that she actually called the FML line on May 4, 5, and 9, 2006. Not only did she never testify that she would have called the line during the 48 hour period after she returned to work, but the record is devoid of any evidence that she would have called or planned to call. Because speculation that Kinsella would have engaged in protected activity alone is insufficient, *see McDonald*, 371 F.3d at 1001, the Court finds that Kinsella has failed to demonstrate a genuine issue of material fact on the issue of her alleged protected activity.

**2. Causal Connection**

Even if Kinsella could show a genuine issue of material fact as to whether she engaged in or would have engaged in protected activity, however, she must also present evidence of a link between her protected status and the adverse employment action. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("Bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action.") (citation omitted). Proof of such a link under the direct method "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion," but also includes "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). Circumstantial evidence of intentional discrimination can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext, and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)).

Here, Kinsella argues that a jury could infer discriminatory animus from the proximity between her alleged call into the FML on May 4, 2006 and her discharge on May 11, 2006. Under the direct method of proof, "[t]emporal proximity, alone, is not enough to establish discriminatory intent" so as to satisfy the causal connection prong. *Kampier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). Moreover, Kinsella admits that she knows of no other similarly situated employees who engaged in similar conduct and were not terminated, that she never believed Mazzucchelli or Kirby (who had final decision-making authority) treated her unfairly, and that American never took adverse actions against her because she exercised her rights under the FMLA. Thus, the Court finds that Kinsella has not presented direct or circumstantial evidence creating the "convincing mosaic of discrimination" required to succeed under the direct method. *See Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009).

### B.     Indirect Method of Proof

Where, as in this case, a plaintiff provides no evidence of retaliation under the direct method of proof, the Court applies the burden-shifting indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect method, Kinsella must first establish a *prima facie* case by showing that she: (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity. *Caskey*, 535 F.3d at 593; *see also Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009). If Kinsella can establish a *prima facie* case of discrimination, the burden will shift to American to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). If American satisfies that burden,

in order to avoid summary judgment Kinsella must establish that there is an issue of material fact as to whether American's proffered reasons are mere pretext for unlawful discrimination. *See id.* The Court finds that Kinsella fails to establish the first, second, or fourth elements of her *prima facie* case.

As explained in Section I(A)(1) above, Kinsella cannot establish the first element of her *prima facie* case because she never engaged in the alleged protected activity of calling in FML or taking FML leave on May 4, 5 or 9, 2006. Even if her testimony created a genuine issue of material fact as to whether she took FML leave on those days, Kinsella also cannot demonstrate that she was meeting American's expectations as a Ticket Agent so as to satisfy the second element of her *prima facie* case. In determining whether an employee is meeting her employer's legitimate expectations, "the issue is not the employee's past performance but whether the employee was performing well at the time of [her] termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 239 (7th Cir. 2002) (internal citation omitted). Kinsella concedes that at the time of her discharge, American determined that she had a pattern of lost time with her husband in and around her scheduled days off, and that she was not credible during an investigation into this pattern by her supervisor. Kinsella further admits that American's policies do not tolerate misrepresentations or abuse of the sick leave allotment. Kinsella offers no evidence that she was meeting American's legitimate expectations that its employees will be honest during investigations and not misuse sick leave at the time of her termination. *See Kariotis v. Navistar Int'l Transportation Corp.*, 131 F.3d 672, 675 (7th Cir. 1997) (finding abuse of sick leave to be a valid reason for terminating an employee where surveillance videos made it clear that the plaintiff was engaging in activities inconsistent with her claimed disability, and affirming summary judgment on her claim of an FMLA violation).

Turning to the fourth element of her *prima facie* case, Kinsella has not alleged that American treated any similarly situated employee more favorably. In fact, Kinsella admits that she does not know of any other employee who engaged in the same conduct she did and was not discharged. Because Kinsella "fails to present any evidence that would allow a meaningful comparison between the circumstances of h[er] discharge and those surrounding the discipline meted out to h[er] would-be comparators," the Court finds that Kinsella has not satisfied her burden of establishing the fourth element of her *prima facie* case for retaliation. *See Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006) (FMLA retaliation case affirming grant of summary judgment to employer where plaintiff failed to present any such evidence). Because "[f]ailure to satisfy any one element of the *prima facie* case dooms an employee's retaliation claim," *Mitchell v. Dutchmen Mfg.*, 389 F.3d 746, 750 (7th Cir. 2004), and Kinsella has failed to establish three such elements, the Court grants American's Motion for Summary Judgment on Kinsella's FMLA retaliation claim.

### III.     FMLA Interference

Section 2615(a)(1) of the FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by [the Act]." 29 U.S.C. § 2615(a)(1). To state a *prima facie* case for a violation of her substantive FMLA rights, Kinsella must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take such leave; and (5) her employer denied her the FMLA leave to which she was entitled. 29 U.S.C. § 2611(4); *De La Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 683 (7th Cir. 2008). An employee who takes FMLA leave and is not reinstated in his or her position may claim a violation of the FMLA. *See Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008)

(explaining that the FMLA entitles eligible employees to a total of twelve work weeks of leave, where the employee has a non-absolute right to reinstatement when she returns). Kinsella does not allege that she was ever denied her right to take FMLA leave; indeed, she concedes that American granted each of her FML requests, in direct contravention of the fifth element of her *prima facie* case. Moreover, as explained above, Kinsella did not call in FML leave in May 2006 and presents no evidence that she intended to call such leave in before her termination. Thus, Kinsella fails to establish the fourth and fifth elements of her *prima facie* case, and the Court grants summary judgment on Kinsella's FMLA interference claim.

**IV.     American's Motions for Sanctions and Dismissal on the Grounds of Perjury**

Because this Court has granted American's Motion for Summary Judgment, American's Motion to Dismiss Kinsella's Complaint on the grounds of her alleged perjury is moot. Kinsella moves, in the alternative, for sanctions for Kinsella's "egregious abuse of the discovery process" through knowingly committing perjury in her deposition. (R. 42 at p. 14.) It is within the Court's inherent authority to sanction any party that abuses the discovery process. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44-45 (1991). Because of their potency, however, the Court's inherent powers must be exercised with restraint and discretion. *Id.* at 43.

Perjury is defined as giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Bermea-Boone*, 563 F.3d 621, 626-27 (7th Cir. 2009) (internal quotations omitted). Although a party may be found to have perjured herself where she admits to lying at her deposition, *see Allen v. Chi. Transit Auth.*, 317 F.3d 696, 702 (7th Cir. 2003), discrepancies in testimony alone do not amount to perjury, *Montano v. City of Chi.*, 535 F.3d 558, 564 (7th Cir. 2008). Here, even

18

though the Court has determined that the record blatantly contradicts Kinsella's testimony, Kinsella did not, like the defendant in *Allen*, admit to lying in her deposition. *See* 317 F.3d at 702. In support of its motion, American points only to Kinsella's cellular and home phone records. While those records contradict Kinsella's testimony, American has failed to show that Kinsella *willfully* gave false testimony, and that her testimony was not a "result of confusion, mistake, or faulty memory." *See Bermea-Boone*, 563 F.3d at 626-27. For that reason, the Court denies Kinsella's Motion for Sanctions for Perjury.

## CONCLUSION AND ORDER

For the reasons stated, the Court grants American's Motion for Summary Judgment and denies its Motions for Sanctions and Dismissal on the Grounds of Perjury.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:   February 9, 2010